Toomey, J.
The plaintiffs, Angelica Hernandez, ppa Esteban Hernandez and Esteban Hernandez (“the Hernandezes”), bring this action for medical malpractice, alleging negligence, breach of express and implied warranties and lack of informed consent. The action arises from the July 9, 1996 medical treatment of plaintiff Angelica Hernandez (“Ms. Hernandez”), who suffered three grand mal seizures during labor and is currently in a vegetative state. Defendants Melissa J. Mead, M.D. (“Dr. Mead”) and Jill Becker, M.D. (“Dr. Becker”) have moved for summary judgment on the grounds that, at the time they treated Angelica Hernandez, they were public employees and thus immunized by G.L.c. 258, §2 from tort liability.
For the following reasons, defendants’ motions for summary judgment are ALLOWED.

BACKGROUND

Viewed in the light most favorable to the plaintiffs, the summary judgment record asserts the following:
A. The Patient
On December 15, 1995, Angelica Hernandez sought prenatal care from Dr. Daniel O’Donnell at the Great Brook Valley Health Center. Her due date was determined to be July 1, 1996. On June 5, 1996, at 36 weeks’ gestation, Ms. Hernandez’ blood pressure was 110/70. When she reached full term, on July 3, 1996, her blood pressure was 140/62. Ms. Hernandez, who had gained 58 pounds during pregnancy, then weighed 158 pounds. Dr. O’Donnell noted slight hand and leg swelling, reviewed the symptoms of toxemia and planned a follow-up visit three days later.
On July 9, 1996, Ms. Hernandez appeared at the Medical Center of Central Massachusetts (“Memorial Hospital”; “Memorial”). At 6:45 p.m., Drs. Becker and Mead examined Ms. Hernandez, noting that she had a headache and hypertension. At 7:45 p.m., Ms. Hernandez’blood pressure was 157/91. By 8:45 p.m., Ms. Hernandez complained that her headache was worse. Her blood pressure had climbed to 168/98. The labor nurse called Dr. Mead, who ruptured Ms. Hernandez’ membranes to augment labor at 9:20 p.m. At 9:33 p.m., Ms. Hernandez suffered a grand mal seizure. Although she received medication intended to prevent further seizures, she had two more seizures, one at 9:50 p.m. and one at 10:04 p.m. At 10:10 p.m., when she was brought to the operating room for a caesarean section, Ms. Hernandez was non-responsive and had no blood pressure. At 10:16 p.m., a code[3] was called. Ms. Hernandez never regained consciousness. She suffered serious neurological injury, resulting in a permanent vegetative state, and currently resides at Wachusett Extended Care.
B. The Doctors
Dr. Mead was a resident in Obstetrics and Gynecology (“Ob-Gyn”) at the University of Massachusetts Medical Center (“UMMC”) from July 1, 1993 to June 30, 1997; Dr. Becker was a resident in Ob-Gyn at UMMC from July 1, 1996 to January 20, 2000. At the time of their involvement in Ms. Hernandez’ care, Dr. Becker was a Post-Graduate Year One (PGY 1) Resident and Dr. Mead was a PGY 4 Resident. Under the terms of their contracts with the Commonwealth, both doctors were required to abide by the rules, regulations, policies and procedures of the UMMC and the Board of Trustees of the University of Massachusetts. Dr. Becker and Dr. Mead were each paid a fixed stipend by the Commonwealth for their work as residents. Those stipends did not depend on the number of patients treated or the number of hours worked. Dr. Becker and Dr. Mead were enrolled in the Commonwealth’s contributory retirement plan and received health, dental and life insurance benefits that are available only to employees of the Commonwealth.
At the time of their care and treatment of Ms. Hernandez on July 9, 1996, Dr. Mead and Dr. Becker were subject to the direction and control of the Director of the UMMC Ob-Gyn Residency Program and were subject to the same level of supervision, direction and control as other PGY 1 and PGY 4 residents. As a PGY 1, Dr. Becker worked under the supervision of an attending physician or a more senior resident and was required to attend regularly scheduled conferences. As a PGY 4, Dr Mead worked under the supervision of an attending physician, was required to attend regular educational conferences and to teach medicine to junior residents and medical students. Drs. Becker and Mead practiced under provisional medical licenses which they obtained through the University of Massachusetts. The provisional licenses limited them *216 to working as residents under the supervision of a fully licensed attending physician. Neither Dr, Becker nor Dr. Mead had the authority to exercise their own independent judgment in caring for patients.
In July 1996 Drs. Becker and Mead were assigned to Memorial Hospital, a private hospital in Worcester, as part of the UMMC Ob-Gyn residency program. The Director of the Residency Program, Dr. Jeffrey Riley, supervised, directed and controlled the administrative aspects of each resident’s involvement in the program. Dr. Riley had final approval of the work schedule, the hours worked, the vacation time and personal time off of all the residents. In addition, Dr. Riley arranged for regularly scheduled, mandatory UMMC educational conferences and was required to teach junior residents and medical students. One of Dr. Riley’s responsibilities was assigning UMMC Ob-Gyn residents to see patients on the UMMC Service at Memorial Hospital. While at Memorial Hospital, the residents remained under the direction, control and supervision of the UMMC Ob-Gyn residency program and were subject to UMMC rules, standards and regulations. Notwithstanding that she presented at Memorial Hospital, Ms. Hernandez was a UMMC patient. With respect to UMMC patients at Memorial, residents reported to the UMMC attending physician who was, on the evening in question, Dr. Kenneth L. Noller.
Assignment to Memorial was a requirement of the UMMC Ob-Gyn residency program. Residents had no admitting privileges at UMMC or Memorial and no discretion over which patients they would treat. They were required to treat the patients who presented during the times the resident was assigned to work. Residents were allowed to take patients’ medical histories, perform physical examinations, order certain tests, review test results and formulate a treatment plan, but the treatment plan was subject to the approval of the attending physician.[4] Residents were required to comply with the bylaws of the hospital to which they were assigned, but the bylaws dealt with administrative issues such as presenting credentials, paying dues, meeting clinical coverage obligations and completing patient records. Although UMMC had an affiliation agreement with Memorial Hospital, all authority for administration of the residency program rested with UMMC.
Memorial Hospital did have a nursing protocol for the treatment of pre-eclampsia, but neither Memorial nor UMMC provided protocols or procedures for treatment by physicians. (Riley Aff. p. 62-64; Noller Aff. p. 74.) And, Memorial required the consent of UMMC in order to prohibit a particular resident from working at the hospital (Riley Aff. p. 54-55).

DISCUSSION

Summary judgment is granted where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. See Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983). The moving party bears the burden of affirmatively demonstrating that there is no triable issue of fact. Pederson v. Time, Inc., 404 Mass. 14, 17 (1989). The question for this court is whether, on the summary judgment materials, there is any genuine issue of material fact as to Dr. Becker and Dr. Mead’s status as public employees at the time they treated Ms. Hernandez at Memorial.
The Massachusetts Tort Claims Act immunizes public employees from civil liability for negligence committed within the scope of their employment. G.L.c. 258, §2. A “public employee” is any employee of a “public employer.” A public employer is defined in part as an agency or institution of the Commonwealth which exercises “direction and control over the public employee.” G.L.c. 258, §1. As an entity supported by state funds, UMMC is an agency of the Commonwealth that employs individuals to work under its direction and control. UMMC is, in the view of this court, indisputably a “public employer.” Our inquiry turns then to the character of defendants’ employment.
Plaintiffs contend that there are material issues of fact as to whether defendants were public employees at the time they cared for Ms. Hernandez. First, plaintiffs argue that UMMC bylaws required residents to comply with the policies and procedures of the hospital to which they were assigned. In particular, plaintiffs point to the deposition of Dr. Mead, in which she stated that she was obliged to follow the policies and procedures of the facility, Memorial Hospital, in which she was working. Plaintiffs also offer a section of the UMMC Personnel Policies, which provides, in pertinent part, “(i)n addition, UMMC Residents shall also abide by the policies, standards, rules, regulations and procedures of the hospitals to which they are assigned . . .” Therefore, plaintiffs assert, because UMMC residents were required to comply with Memorial Hospital bylaws, there is a factual issue as to whether the residents were subject to the control of Memorial Hospital and hence were not public employees.
Plaintiffs rely primarily on a Supreme Judicial Court case in which the Court found genuine issues of material fact as to whether a doctor in a residency program at a public hospital remained a public employee when she was assigned to the emergency room of a private hospital as part of her residency. See Kelly v. Rossi, 395 Mass. 659, 665 (1985). But, in Kelley, the evidence showed that during the day the resident worked with and studied under a doctor on the staff of the private hospital; the hours of her shift as a resident in the emergency room were fixed by the private hospital; she could neither admit nor discharge a patient without the permission of a physician designated by the hospital; and she was obliged to follow the policies and procedures of the private hospital set forth, in the resident’s words, in “massive volumes.” *217 In addition, residents arriving at the hospital received an orientation describing their administrative and clinical responsibilities at the hospital and the hospital could determine that it no longer wanted a particular resident’s services. Under those facts, the Court found genuine issues of material fact as to whether the residents were public employees. Kelley at 695.
The facts at bar are at a far remove from Kelley. For UMMC patients like Ms. Hernandez, UMMC residents assigned to Memorial Hospital received all their supervision and education from other UMMC residents and attending physicians, not from the private hospital. Similarly, it was the UMMC Director of the residency program, not the private hospital, that supervised, directed and controlled the administrative aspects of the residents’ involvement in the program, including the residents’ work schedules.
Plaintiff further argues that, because Memorial Hospital had a protocol for treating patients with signs and symptoms of pre-eclampsia, residents were required to follow those policies and procedures. Therefore, plaintiffs contend, there is a genuine issue of material fact as to whether Dr. Mead was under the control of Memorial Hospital at the time she treated Ms. Hernandez. The document submitted by plaintiffs, entitled "Standard VI ‘E’: Eclampsia/pre-eclampsia and mag sulfate administration,” is a manual prepared for nurses and signed by the Director of Maternal-Infant Nursing. The instructions include several instances in which the nurse is to “notify physician.” There is no evidence that the Memorial Hospital policies and procedures apply to anyone other than the nursing staff for whom they were designed or that they in anyway controlled the actions of UMMC physicians such as defendants. Dr. Noiler and Dr. Ryan offered undisputed testimony that the document is a nursing protocol which does not apply to physicians. The document cannot, accordingly, support the plaintiffs’ view that the defendants were subject to its direction.
Although the plaintiffs offer several examples of routine medical tasks performed by residents at Memorial Hospital, the record is devoid of any evidence of the instrumentality by which Memorial Hospital might have supervised such activities or otherwise controlled or directed UMMC residents in the care of UMMC patients. There is nothing in the case at bar which mirrors Kelley’s factual dispute over the direction and control enjoyed by the private hospital, and, contrary to plaintiffs’ contention, Kelley is not precedent for denial of the instant Rule 56 motion.

CONCLUSION

Plaintiff has presented no factual evidence that the UMMC residents caring for UMMC patients at Memorial Hospital were under the supervision or control of anyone other than UMMC. Consequently, there are no genuine issues of material fact as to defendants’ status as public employees and defendants are entitled to judgment as a matter of law.[5]

ORDER

For the foregoing reasons, it is hereby ORDERED that the motions of Melissa Mead, M.D. and Jill Becker, M.D. for summary judgment axe ALLOWED.

 in medical parlance, a “code” is a broad notice of an emergency and a summonsing of all available resources to aid the patient.

 Although residents could obtain the approval of a private attending physician for a private patient, UMMC attending physicians were responsible for supervising the care of all UMMC patients.

 Contrast Moran v. Caulkins, M.D., 12 Mass. L. Rptr. No. 29, 667 (April 16, 2001) (Butler, J.), in which the court recognized a factual dispute as to whether a UMMC attending physician was subject to the direction and control of a public employer where no one controlled physician’s day-to-day activities or directly supervised treatment decisions and physician was not required to seek anyone’s opinion before performing surgery.